## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| HEIDI N. KEETON, | : | |
| Plaintiff, | : | |
| | | Case No. 3:13cv00297 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

Plaintiff Heidi Keeton brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  *See* 42 U.S.C. §§405(g), 1383(c)(3).  She contends that substantial evidence does not support Administrative Law Judge Amelia G. Lombardo's decision (*PageID*## 909-26) to deny her applications.[2]  Keeton asserts in this Court, as she did before the Administration, that she is eligible for benefits because she is under a benefits-qualifying disability due to certain mental disabilities – bipolar disorder,

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] The *PageID#* citations in this Report, unless otherwise indicated, are found in the complete Certified Administrative Record. (Doc. #12).

depression, and panic disorder.  She does not challenge the ALJ's decision regarding her physical impairments.

The case is before the Court upon Keeton's Statement of Errors (Doc. #13), the Commissioner's Memorandum in Opposition (Doc. #15), Keeton's Reply (Doc. #16), the administrative record (Doc. #12), and the record as a whole.

## II.    Background

### A.    Keeton's Vocational Profile and Testimony

Keeton was 28 years old on her alleged disability onset date, placing her in the category of a "younger person" for purposes of resolving her DIB and SSI claims.  *See* 20 C.F.R. §§404.1563(c); 416.963(c);[3] *PageID*## 924, 1195.  She obtained a high-school education, as shown by her GED.  *See* 20 C.F.R. §404.1564(b)(4); *PageID*# 1208.  She has past relevant employment as an accounts adjustable clerk and department manager. (*PageID*## 924, 1201).

Keeton testified at her administrative hearing that she has a driver's license but does not drive due to pain and medication.  (*PageID*# 937).  She lived in a basement apartment in her parent's home.  (*Id.*).  At the time of the hearing, she was separated from her husband due to her mood swings.  (*PageID*## 944, 948).  For a brief while she had lived in the home of her former husband's parents but was forced to leave due to constant fighting.  (*PageID*# 948).

_____

[3] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

Keeton explained that she was severely depressed and had panic attacks fives time a day plus severe mood swings.  (*PageID* # 942).  She further stated, "I don't – I basically have no sort of life.  I stay secluded down in the basement of my parents' house and I recently went to Mercy Mental Health because I just couldn't deal with things anymore, and they scheduled me to the psychiatrist there ...."  (*PageID* # 942-43).  Although a family physician prescribed psychiatric medication for Keeton, the physician told Keeton that she could not prescribe the medication she needs.  (*PageID* # 943).

Keeton stopped receiving mental-health treatment with licensed social worker Lily Stegman.  Keeton testified, "[Ms. Stegman] was telling me what to do and she thinks I should do in my life that I just didn't want to hear at that time."[4]  (*Id.*).

When asked about her alcohol intake, she responded that had she stopped drinking.  But she also acknowledged she had two drinks one week before the ALJ's hearing.  (*Id.*).  Keeton noted that she had not taken any illegal narcotics since 2009, adding, "maybe one time at a friend['s] house and that was it."  (*PageID* # 944).

As to her mood swings, Keeton testified that she has pushed everyone away, including all of her family and friends.  She stated, "I don't like interacting with people." (*PageID* # 949).  Her mood swings began in 2009 after she was raped.  (*Id.*).  During that traumatic event, Keeton thought she was going to be killed.  She described the lasting affects as follows:  "I'm severely depressed.  I blame myself.  I don't like being around me

---

[4] Keeton began seeing Ms. Stegman in late July 2011.  (*PageID* # 1649).

in general ....  I'm in the basement most of the time.  And that's – I didn't always used to be like this and – when I was younger I had many friends, and now I just don't have anybody."  *Id*.  She explained that she has flashbacks, which cause her to start shaking and cause her to have panic attacks.  Describing her panic attacks, Keeton noted, "I just feel like I'm going to die.  I can't breathe.  I start shaking.  I check my pulse.  I don't like being around anybody and they can last anywhere from 15 minutes to an hour."  (*PageID* #950-51).

During the hearing, the ALJ asked Keeton about her ability to be in a job setting with either a male boss or male coworkers.  She answered, "I know it sounds horrible, but I just hate men.  It seems like all my life they've done nothing but hurt me.  When my – when I was a step – my step-brother, of half-brother, he hurt me when I was younger, and then this guy did this to me.  I just don't like being told what to do by a man especially." (*PageID* #950)

Keeton reported that she had thoughts of hurting herself.  On one such occasion, she was, in her word, "institutionalized."  (*PageID* #952).  She testified:

> That's when I got into it with my brother that sexually abused me when I was a child, and him and his wife were at my mom's house and they – his wife said, well, you just need to get over stuff like that.  Things like that happen every day, and they – I just felt like they were cornering me.  So I just felt like I just didn't want to live anymore, and I – my, my – that was when I was with my ex-husband – and I went to take a bunch of pills, and he knocked them out of my had and took me to Mercy Mental Health.

(PageID at 952-53).

### B.     Relevant Medical Opinions[5]

### George Schulz, Ph.D.

Dr. Schulz interviewed and evaluated Keeton on October 27, 2007, for the Ohio

Bureau of Disability Determination (BDD).  (*PageID*## 1320-26).  Dr. Schultz diagnosed

Keeton with bipolar disorder type II, alcohol abuse, borderline personality disorder.

(*PageID*# 1324).  He further wrote:

> In terms of symptoms, affect was noted as appropriate and congruent.
> Motor activity was noted as calm.  Mood was noted as euthymic.  There
> were no observed physiological correlates related to affect and mood such as
> saddened facial musculature, psychomotor retardation, or motoric or
> autonomic signs of anxiety.  She did not present any suicidal or homicidal
> intent....

(*PageID*# 1323-24).  As to Keeton's mental work abilities, Dr. Schulz opined that she is

moderately impaired in her ability to relate to others, including supervisors and coworkers;

minimally impaired in her ability to understand, remember, and follow instructions;

minimally impaired in her "ability to maintain attention, concentration, to perform simple

repetitive tasks with adequate pace and perseverance"; and moderately impaired in her

ability to withstand the stress and pressures associated with day-to-day work activity.

(*PageID*# 1325-26).

### Patricia Semmelman, Ph.D.

State agency psychologist, Dr. Semmelman, reviewed the record on November 7,

---

[5] Keeton does not challenge the ALJ's evaluation of the medical evidence as to her exertional
impairments.  Accordingly, the Court will focus its review of the medical evidence on Keeton's mental
impairments.  *See* Doc.# 13 at *PageID*# 1710.

2007.  (*PageID*## 1329-47).  Dr. Semmelman checked boxes on a form indicating that in her opinion, Keeton had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; with no episodes of decompensation.  (*PageID*# 1344).

Dr. Semmelman also completed a Mental Residual Functional Capacity Assessment where she found that Keeton had moderate limitations in her abilities to carry out detailed instruction; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting.  (*PageID*## 1330-31).  Dr. Semmelman found that Keeton was not significantly limited in the remaining mental-work-related abilities listed in this form.  (*Id.*).

Dr. Semmelman determined that Keeton's allegations are partially credible.  (*PageID*# 1333).  She concluded that as long as Keeton was sober, she is capable of performing moderately complex tasks, but Keeton would have difficulty interacting with others on a prolonged basis and would perform best working alone.  (*Id.*).

**Daniel Hrinko, Psy.D.**

In August 2009, Dr. Hrinko interviewed and evaluated Keeton for the Ohio BDD. (*PageID*## 1379-82).  Keeton reported mild to moderate panic attacks on a daily basis, as well as flashbacks to prior episodes of abuse.  (*PageID*# 1381).  Keeton also reported making suicide attempts on "many" occasions, the most recent being three months prior to the evaluation.  (*PageID*# 1380).  Keeton told Dr. Hrinko that she used cocaine on "one" occasion three months prior.  (*Id.*).  Dr. Hrinko found Keeton had a "somewhat bland" affect and a mild level of depression, and [t]here were no indications to suggest that she was exaggerating or minimizing her difficulties."  (*Id.*).  Dr. Hrinko noted that Keeton "views herself as worthless, helpless, and ugly.  She frequently wishes she were dead." (*Id.*).  In his summary, Dr. Hrinko stated that Keeton "has a history of being sexually abused by an older half-brother and others in gaining no help or support from her mother creating a traumatic childhood existence.  She acted out many of her angers and frustrations in school, was involved in an abusive relationship with her first husband, and had an unsatisfying relationship with her second husband that revolved around her mutual use of mood altering drugs and substances.  She experiences frequent panic attacks, episodes of depression, frequent thoughts of killing herself, and has made frequent attempts throughout her life that most recent being three months ago."  (*PageID*#1381-82).

Dr. Hrinko diagnosed Keeton with (1) major depressive disorder, recurrent, severe; and (2) post-traumatic stress disorder, chronic.  (*PageID*# 1382).  Discussing Keeton's

7

work-related mental abilities, Dr. Hrinko explained:

> At this time, due to psychological factors alone, [Keeton's] ability to relate
> with coworkers and supervisors is markedly impaired.  Her temper outbursts,
> flashbacks, panic attacks, and fear of being abused by those around her
> impact her ability to establish and maintain appropriate positive working
> relationships.
>
> Her ability to understand and follow instructions, based on memory skills,
> shows no impairment.  Her ability to maintain attention to perform simple
> and repetitive tasks is moderately impaired.  Her moods and other
> difficulties associated with her mental health problems interfere with her
> concentration.
>
> Her ability to withstand the stress and pressure of employment is moderately
> impaired.

(*PageID*# 1382).

### Suzanne Castro, Psy.D. and Todd Finnerty, Psy.D.

State agency psychologist, Dr. Castro, reviewed the current record on November 9,

2009.  (*PageID*## 1391-1408).  Dr. Castro determined that Keeton had mild restrictions in

activities of daily living; moderate difficulties in maintaining social functioning; moderate

difficulties in maintaining concentration, persistence or pace; with no episodes of

decompensation.  (*PageID*# 1401).

Dr. Castro also completed a Mental Residual Functional Capacity Assessment in

which she found that Keeton had the same moderate work related limitations as found by

Dr. Semmelman.  (*PageID*## 1405-06).  Dr. Castro determined that Keeton's allegations

are partially credible.  (*PageID*# 1407).  Dr. Castro discounted Dr. Hrinko's marked

limitation findings because Keeton reported she had a fiancé, she lacked mental health

8

treatment at that time, and she talked to her mother daily.  (*Id.*).  Dr. Castro concluded that Keeton could carry out both simple and multi-step instructions, interact with others on a superficial and intermittent basis, and work without strict time or production requirements. (*Id.*).  On April 21, 2010, another state agency psychologist, Dr. Finnerty, reviewed the record and affirmed Dr. Castro's opinion without providing any supporting analysis. (*PageID#* 1426).

**<u>Lily Stegman, Licensed Social Worker</u>**

Keeton met with Ms. Stegman for an initial assessment on July 27, 2011. (*PageID##* 1649-60).  Keeton sought help in managing her bipolar disorder, mood swings, anxiety, and panic attacks.  (*PageID#* 1649).  She reported that her mind races and she "goes off on people." (*PageID#*1657).  She was taking ½ of Xanax to sleep; without it, she sleeps 3 or 4 hours.  She separated from husband due to her mood swings.  She told all her friends to "screw off, does not have anything to do with them."  (*Id.*).  In November 2010, she tried to slit her wrist when she found out her husband was seeing someone else. She has fleeting suicidal thoughts and talking to her mom keeps her from acting on them. At the time of this assessment, Keeton reported she was living with a female friend.  She further reported that she "feels worthless, like I can't do nothing."  (*Id.*).  She is "scared to work due to chronic back pain and going off on people at work.  History of going off on people at every job she has had in the past."  (*PageID#* 1657).

Keeton also reported a traumatic ordeal when she was raped in the past year.  "She

had been drinking when it happened, has flashbacks and dreams about the incident. Less now than right after it happened." (*Id*.). She did not have then-current suicidal ideation. And reported no hallucinations or delusions. (*Id*.).

Ms. Stegman observed that Keeton was moderately depressed, anxious, and irritable. She diagnosed Keeton with bipolar I disorder, mixed without psychotic features, panic disorder without agoraphobia, post-traumatic stress disorder, and borderline personality disorder. (*PageID##* 1658, 1660).

Ms. Stegman had monthly therapy appointments with Keeton between July and November 2011. (*PageID##* 1639-47). The records show that Keeton attended three appointments and talked with Ms. Stegman over the phone for two. She missed two other appointments. (*Id.*).

On November 3, 2011, Ms. Stegman completed a mental residual functioning capacity questionnaire in which she opined that Keeton was markedly impaired in her abilities to accept instruction from or respond appropriately to criticism from supervisors or superiors; to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes to respond appropriately to co-workers or peers; to perform and complete work tasks in a normal work day or week at a consistent pace; to maintain attention and concentration for more than brief periods of time; to perform at production levels expected by most employers; to respond appropriately to changes in work setting; and to tolerate customary work pressures. (*PageID#* 1611-13). Ms.

10

Stegman opined that Keeton was extremely impaired in her ability to behave predictably, reliably, and in an emotionally stable manner.  (*PageID* # 1612).  She further opined that Keeton was likely to deteriorate under stress in a work environment based on her observed and past behaviors.  (*PageID* # 1613).  And Ms. Stegman questioned Keeton's ability to handle funds due to impulsive spending habits as well.  (*Id.*).

**III.**   **Administrative Review**

**A.**   **"Disability" Defined**

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

**B.**   **ALJ Lombardo's  Decision**

ALJ Lombardo found that Keeton was not under a benefits-qualifying disability by applying the five-Step sequential evaluation procedure required by Social Security Regulations.  *See PageID* ## 913-14; *see also* 20 C.F.R. § 404.1520(a)(4).  The ALJ's conclusions at Steps 3, 4, and 5 are pertinent to this case.

11

At Step 3, ALJ Lombardo concluded that Keeton's mental impairment or combination of impairments did not meet or equal the criteria in the Commissioner Listing of Impairments, including the Listings for affective disorders, anxiety-related disorders, and personality disorders (Listings 12.04, 12.06, and 12.08, respectfully).  (*PageID*## 915-16).

At Step 4, the ALJ concluded that Keeton retained the mental residual functional capacity[6] to perform "simple, repetitive tasks that are low stress (defined as no assembly line production quotas and not fast paced); and no more than occasional contact with the general public, coworkers, and supervisors."  (*PageID*# 917).

The ALJ concluded at Step 5 that despite Keeton's mental-work limitations, she is able to perform a significant number of sedentary-unskilled jobs that are available in the economy (final assembler, dowel inspector, and microfilm document preparer).  (*PageID*# 925).

## IV.  **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).

---

[6] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

V.    <u>**Discussion**</u>

Keeton challenges the ALJ's rejection of the medical source opinions provided by Ms. Stegman because the ALJ's reasons were not supported by facts or evidence and because the ALJ improperly required objective signs and findings to support Ms. Stegman's opinions.  Keeton emphasizes that Ms. Stegman's findings were consistent with Dr. Hrinko's findings and the findings in the multiple psychological examinations documented.  She further argues that the ALJ improperly placed great weight on the opinions of the non-examiners, including Dr. Castro.

The Commissioner contends that substantial evidence supports the ALJ's findings concerning Keeton's mental residual functional capacity.  The Commissioner reasons that the ALJ properly discounted Dr. Hrinko's opinions, and properly rejected Ms. Stegman's opinions, and properly placed more weight on the opinions of Drs. Castro, Semmelman, and Finnerty, which were consistent with Dr. Schulz's opinions.

Social Security Regulations require ALJs to consider opinions provided by all medical sources in addition to the other relevant record evidence.  *See* 20 C.F.R. §§404.1513, 404.1527(b).  The Regulations distinguish between "acceptable medical sources" – *e.g.*, physicians, psychologists, optometrists, podiatrists – and "other sources – *e.g.*, therapists, physician assistants, and nurse practitioners.  *See* 20 C.F.R. §404.1513(a), (d).

As a non-physician therapist, Ms. Stegman is not considered to be an "acceptable

14

medical source"; rather, she is deemed one of the "other sources" the Regulations identify. *Id*. Given this lesser status, her opinions alone "cannot establish the existence of a medically determinable impairment ...." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Still, her information "may provide 'insight into the severity of the impairment(s) and how it affects the individual's ability to function.'" (*Id*. (quoting, in part, Soc. Sec. Ruling 06-03p, 2006 WL 2329939 at *3 (Aug. 9, 2006)).

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners ... have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists. Opinions from these medical sources who are not technically deemed "acceptable medical sources," under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.

*Cruse*, 502 F.3d at 541 (quoting, Soc. Sec. Ruling 06-03p, 2006 WL 2329939 at *4).

When considering opinions presented by "other sources," certain factors set forth in the Regulations can apply, including how long the source knew the claimant, how consistent the source's opinions are with the other record evidence, the degree the source presents supporting evidence, how well the source explains his or her opinions, and the source's "expertise." *Id*. *See* Soc. Sec. Ruling 06-3p, 2006 WL 2329939 at *4. "These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources ....'" *Id*. The Commissioner, through Ruling 06-3p, further instructs:

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources".... Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability ... decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939 at *6.

As set forth previously, *supra*, §III(B), the ALJ's assessment of Keeton's mental residual functional capacity limited her to "simple, repetitive tasks that are low stress (defined as no assembly line production quotas and not fast paced); and no more than occasional contact with the general public, coworkers, and supervisors." (*PageID* # 917). That assessment was far less restrictive than the work limitations set by Ms. Stegman, and it was likewise far less restrictive than the assessment by consulting psychologist, Dr. Hrinko.  In November 2011, for instance, Ms. Stegman explained that Keeton has quit jobs in the past when she felt pressured on a job; she has a history of blowing up and isolating herself; she feels like she is backed in a corner when pressured; she has low tolerance for stress; and she constantly thinks people are saying negative things about her.  Ms. Stegman also noted that Keeton engaged in impulsive spending when she has money and suffers from severe mood swings, panic attacks, depression, difficulty getting out of bed, low motivation to do anything, and feels hopeless.  (*PageID* # 1613).

The ALJ gave little weight to Ms. Stegman's opinions on the ground that she

16

lacked "a long-standing relationship" with Keeton and because Ms. Stegman relied on

Keeton's subjective complaints, which the ALJ found lacked credibility. (*PageID#* 924).

The ALJ concluded that "[Ms. Stegman's] opinion is also unsupported by objective signs

and findings in the record." (*Id.*). Substantial evidence does not support this reasoning.

By requiring objective signs and findings, the ALJ focused on the wrong type of

evidence. Under the Regulations, the existence of a medically determinable mental

impairment requires a statement of symptoms as well as "psychiatric signs," which are

"medically demonstrable phenomena that indicate specific psychological abnormalities,

e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or

perception, as described by an appropriate medical source." Listing § 12.00B, Appendix

1, Subpart P, Part 404. The Sixth Circuit Court of Appeals has rejected the need for

objective medical evidence to support a claimed mental impairment, stating as follows:

> [A] psychiatric impairment is not as readily amenable to substantiation by
> objective laboratory testing as a medical impairment . . . [C]onsequently, the
> diagnostic techniques employed in the field of psychiatry may be somewhat
> less tangible than those in the field of medicine . . . In general, mental
> disorders cannot be ascertained and verified as are most physical illnesses,
> for the mind cannot be probed by mechanical devices in order to obtain
> objective clinical manifestations of medical illness . . . [W]hen mental
> illness is the basis of disability claim, clinical and laboratory data may
> consist of the diagnosis and observations of professionals trained in the field
> of psychopathology. The report of a psychiatrist should not be rejected
> simply because of the relative imprecision of the psychiatric methodology or
> the absence of substantial documentation, unless there are other reasons to
> question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (citations omitted). Without

17

these requirements, an ALJ could reject any psychological opinion as being based on subject complaints alone – *i.e.*, lacking objective supporting evidence.  *See Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009).  After all, "psychology and psychiatry are, by definition, dependent on subjective presentations by the patient." *Id*.

In the present case, there is no indication in the ALJ's decision that she found Ms. Stegman's diagnostic techniques flawed or lacking.  There was no valid reason to question Ms. Stegman's diagnostic techniques, and the ALJ provided no reason for doing so that is supported by evidence of the record.  Ms. Stegman's diagnostic assessment, moreover, was quite similar to every other diagnostic assessment of record in terms of the observed symptoms and signs with the prominent addition of the impact the December 2009 "gang rape" had on Keeton.  (*PageID#* at 1654).  Ms. Stegman noted that Plaintiff reported having flashbacks and dreams about the gang rape.  (*PageID#* 1657).  Ms. Stegman noted that Keeton has panic attacks, mood swings, poor sleep, and believed that people were always thinking negatively about her.  (*PageID##* 1654-55).  Perhaps most significantly, Ms. Stegman is both the only sole mental-health source of record who treated Keeton and the only mental-health source who saw Keeton after the gang rape occurred.  Ms. Stegman is therefore the only medical source who considered the impact the traumatic event had on Keeton.

Additionally, Ms. Stegman explained the basis her opinions about Keeton's work

18

limitations, stating, "In the past she has just quit when pressured on a job.  History of blowing upon and fighting, feels like she is backed into a corner when pressured[,] low tolerance for stress[,] constantly thinks people are talking negative about her."  (*PageID#* 1613).  The ALJ did not indicate that she considered this aspect of Ms. Stegman's opinions.

Although Ms. Stegman's opinion by itself "cannot establish the existence of a medically determinable impairment ...," *Cruse*, 502 F.3d at 541, her opinion is largely consistent with and thus supported by the assessment of examining psychologist Dr. Hrinko.  *See PageID##* 1379-82.  The ALJ acknowledged that Dr. Hrinko found marked restrictions in areas of social functioning and stress tolerance.  (*PageID#* 923).  The ALJ nonetheless rejected the opinion finding the marked restrictions "are not supported by the evidence.... [Keeton] described a relatively full range of daily activities in 2007 and 2008 and got married in 2010; her recent statements that she lies in bed all day and that her mother does everything for her are not supported by the record."  (*Id.*).  The ALJ discounted Dr. Hrinko's opinions because he "relied heavily" on Keeton's complaints.  Substantial evidence does not support this finding because Dr. Hrinko's evaluation report concerning Keeton's mental status is replete with his observations of Keeton's psychological signs and symptoms rather merely relying on her subjective statements alone.  For instance, Dr. Hrinko noted that Keeton presented with "no indications to suggest she was exaggerating or minimizing her difficulties."  (*PageID#* 1380).  He further

19

observed, "There were no indications of any unrealistic or confused qualities about her thinking process." *Id*. He observed "no indications of distorted perceptions such as delusions or hallucinations. He also noted, "There were no indications of any realistic or confused qualities about her thinking process." *Id*. And he observed that Keeton's affect was "somewhat bland." In this manner, Dr. Hrinko's report reveals that he clinically evaluated her statements and did not blindly accept them as true. This tends to support, rather than invalidate, his opinions concerning Keeton's mental work abilities.

The multiple psychological examinations in the record all documented a similar range of findings consistent with the limitations opined by Ms. Stegman and Dr. Hrinko. Beginning with the 2004 Bureau of Vocational Rehabilitation assessment through Dr. Stegman's 2011 intake assessment, all mental status examinations revealed depressed and anxious mood with some form of abnormal affect. (*PageID#* 441, 448, 473, 493, 524, 534, 550, 824, 830). All of Keeton's examinations returned GAF scores within a range between 35 and 55. (*PageID#* 444, 494, 520, 536, 552, 828; PageID No. 455-56 (legible copy PageID No. 1285-1286). Her most common GAF score was 50, indicative of serious symptoms or serious impairment in social, occupational, or school functioning. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> IV-TR (DSM IV-TR) at 34. Although the ALJ provided many reasons why she found that the GAF scores were only reflective of that current period of assessment, it cannot be refuted that across a record that covered eight years of psychiatric history, only three times out of

20

the eight times GAF scores were recorded was Keeton's score above 50.  And none of her scores above 50 were later than 2007. (*PageID*# 494).  The ALJ claimed that the preponderance of the examination findings evidence and consistency of GAF scores was commensurate with moderate symptoms.  This, however, conflicts with the majority of the examination evidence, which supported serious impairments in Keeton's mental work abilities.

Turning briefly to the evidence the ALJ relied on, she credited the opinions of consultative psychologist, Dr. Schulz, and the opinions of non-examining state agency psychologists, Drs. Semmelman, Castro, and Finnerty.  (*PageID*# 923).  The ALJ placed "significant weight" on the opinions provided these non-treating medical sources because their opinions "are generally supported by objective signs and findings upon examination and in the preponderance of the medical record, including those records submitted after their assessments."  (*PageID*# 923).  Yet, the ALJ failed to indicate what other "objective signs and findings" in the record is consistent with these opinions.  Such an indication was needed given the typical absence of objective medical evidence in support of mental-health opinions.  *See Blankenship,* 874 F.2d at 1121 ("In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of medical illness.").  As noted above, none of these medical sources considered the impact the December 2009 rape had on Keeton because it post-dated their opinions.

21

Accordingly, Keeton's challenges to the ALJ's evaluation of the medical source opinions of record are well taken.[7]

## VI.    Remand is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See Id.*  However, Keeton is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to the problems discussed *supra*.

On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the

---

[7] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining challenges to the ALJ decision is unwarranted.

Commissioner's Regulation and Rulings and by case law; and to evaluate Keeton's

disability claim under the required five-Step sequential analysis to determine anew whether

Keeton was under a disability and whether her applications for DIB and SSI should be

granted.

### IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff Heidi N. Keeton was under a
         "disability" within the meaning of the Social Security Act;

3.      This matter be **REMANDED** to the Social Security Administration under
         Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent
         with this Report and Recommendations, and any decision adopting this
         Report and Recommendations; and

4.      The case be **TERMINATED** on the docket of this Court.


October 9, 2014

                              _____s/Sharon L. Ovington_____
                                    Sharon L. Ovington
                              Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474  U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947, 949-50 (6th Cir. 1981).